No. 23-30193

# In the United States Court of Appeals for the Fifth Circuit

IN RE CITY OF NEW ORLEAS AND
THE NEW ORLEANS POLICE
DEPARTMENT

*Petitioner.*

\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

*Plaintiff,*

v.

CITY OF NEW ORLEANS,

*Defendant.*

_____

On Petition for Writ of Mandamus to the United States District Court
for the Eastern District of Louisiana

_____

**AMICUS BRIEF OF THE STATE OF LOUISIANA IN SUPPORT OF
PETITIONER'S EMERGENCY PETITION FOR WRIT OF MANDAMUS**

_____

JEFF LANDRY
Attorney General of Louisiana

LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766

ELIZABETH B. MURRILL
Solicitor General
*Counsel of Record*
MurrillE@ag.louisiana.gov

SHAE MCPHEE
Deputy Solicitor General

MORGAN BRUNGARD
Assistant Solicitor General

JOSEPH NELSON
Assistant Solicitor General

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of certifies that, pursuant to the fourth sentence of Fifth Circuit Rule 28.2.1, Petitioner the City of New Orleans, Respondent the United States of America, and Amicus Curiae the State of Louisiana are governmental entities and, therefore, need not furnish a certificate of interested persons.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES……………………………ii

TABLE OF AUTHORITIES ....................................................... iv

INTEREST OF AMICUS CURIAE ............................................. 1

SUMMARY OF THE ARGUMENT………………………………………3

ARGUMENT ........................................................................... 6

    I.    CONSENT DECREES IN INSTITUTIONAL REFORM CASES ARE "PERNICIOUS" THREATS TO FEDERALISM ................................... 6

    II.    THE DISTRICT COURT'S OVER-READING OF THE CONSENT DECREE USURPS POWER FROM THE STATE ............................. 13

    III.    THE DISTRICT COURT SHOULD PROTECT FEDERALISM BY WORKING TO RETURN NOPD TO LOCAL CONTROL, NOT ORDERING INJUNCTIONS BEYOND THE CONSENT DECREE'S TERMS ................................................................................. 17

CONCLUSION .................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Allen v. Louisiana,*
  14 F.4th 366 (5th Cir. 2021) ...................................................................5

*Atascadero State Hosp. v. Scanlon,*
  473 U.S. 234 (1985) ........................................................................... 2

*Berry v. Pastorek,*
  No. 2:10-cv-04049 (E.D. La.) ........................................................... 13

*Boudreaux v. Sch. Bd. of St. Mary Par.,*
  No. 6:65-cv-11351 (W.D. La. Apr. 5, 2022).................................... 13

*Chisom v. Edwards,*
  342 F.R.D. (E.D. La. 2022) ............................................................... 11

*Chisom v. Louisiana,*
  No. 22-30320 (5th Cir.) ..................................................................... 12

*Citizens for a Better Env't v. Gorsuch,*
  718 F.2d 1117 (D.C. Cir. 1983) .........................................................9

*City of New Orleans v. Anderson,*
  9 La. Ann. 323 (La. 1854) ................................................................ 15

*Craig v. Harney,*
  331 U.S. 367 (1947)............................................................................ 17

*Freeman v. Pitts,*
  503 U.S. 467 (1992)............................................................................ 18

*Frew ex rel. Frew v. Hawkins,*
  540 U.S. 431 (2004) ................................................................. passim

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ............................................................................9

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) ............................................................................ 2

iv

*Horne v. Flores,*
    557 U.S. 433 (2009)................................................................1, 8, 11, 12

*In re Gee,*
    941 F.3d 153 (5th Cir. 2019)..........................................................1, 8, 9

*Frew v. Janek,*
    820 F.3d 715 (5th Cir. 2016) ................................................................8

*Kelley v. Johnson,*
    425 U.S. 238 (1976)……………………………………………………..3, 14

*La. State Conf. of NAACP v. Louisiana,*
    No. 19-cv-479-JWD-SDJ, 2022 WL 2753069 (M.D. La. July 13, 2022)
    ......................................................................................................10

*M. D. by Stukenberg v. Abbott,*
    907 F.3d 237 (5th Cir. 2018).................................................................7

*McCulloch v. Maryland,*
    17 U.S. 316 (1819)................................................................................2

*Metro. Housing Dev. Corp. v. Village of Arlington Heights,*
    616 F.2d 1006 (7th Cir. 1980) ...............................................................9

*Missouri v. Jenkins,*
    515 U.S. 70 (1995) ...............................................................................1

*Moore v. Tangipahoa Par. Sch. Bd.,*
    No. 21-30244 (5th Cir. Dec. 24, 2021) .................................................13

*Rufo v. Inmates of Suffolk Cnty. Jail,*
    502 U.S. 367 (1992)..........................................................................9, 10

*Thomas v. Sch. Bd. St. Martin Parish,*
    544 F. Supp. 3d 651 (W.D. La. 2021)……………………………………1, 11

*United States v. Armour & Co.,*
    402 U.S. 673 (1971)..............................................................................9

*Younger v. Harris,*
    401 U.S. 37 (1971)............................................................................2, 7

v

## Constitution

La. Const. art. 4 § 8
La. Const. art. 6 § 2
La. Const. art. 6 § 4
La. Const. art. 6 § 5(A)
La. Const. art. 6 § 9(B)
La. Const. art. 6 § 44(1)–(3)
La. Const. art. 6 § 5(A), (E)
La. Const. art. 6 § 5(E)
La. Const. art. 6 § 9(B)

## Other Authorities

DOUGLAS LAYCOCK, Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties, 1987 U. Chi. Legal F. 103 (1987)........11

Home Rule Charter art. 2 § 2-101(4).......................................................19

Records 1805-1836, City Archives, New Orleans Public Library, http://archives.nolalibrary.org/~nopl/inv/neh/nehab.htm#ab4......18, 19

MARK KELLEY, *Saving 60(B)(5): The Future of Institutional Reform Litigation*, 125 Yale L.J. 272 (2015).......................................................13

MICHAEL T. MORLEY, *Consent or the Governed or Consent of the Government? The Problems with Consent Decrees in Government Defendant Cases*, 16 U. Pa. J. Const. L. 637 (2014)...........................10

*New Orleans Incorporated, 200 Years of the City Charter*, http://archives.nolalibrary.org/~nopl/exhibits/charter/charterintroduction.htm ................................................................................................18

Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Government Entities, https://www.justice.gov/opa/press-release/file/1109681/download.......14

## INTEREST OF AMICUS CURIAE[1]

The State of Louisiana supports the City of New Orleans' Petition for a Writ of Mandamus to cancel the public hearing scheduled for next Wednesday, April 12, at 2:00pm. The State agrees that the City has satisfied the requirements of mandamus relief. But the State's interest goes beyond supporting the City's fight against federal judicial overreach. The State has its own dog in this fight.

This case presents a perfect—and disturbing—example of the consent-decree creep in institutional reform cases that threatens the proper balance between *state* and federal powers. *See Horne v. Flores*, 557 U.S. 433 (2009); *Missouri v. Jenkins*, 515 U.S. 70, 131–33 (1995) (Thomas, J., concurring) (giving a historical explanation of the "[t]wo clear restraints on the use of the equity power—federalism and the separation of powers—[that] derive from the very form of our Government."); *In re Gee*, 941 F.3d 153 (5th Cir. 2019). This balance is

---

[1] Federal Rule of Appellate Procedure 29(a)(4)(D) requires Louisiana to identify the source of its authority to file this brief. Because Louisiana is a State, Rule 29(a)(2) gives it permission to file "without the consent of the parties or leave of court," and Rule 29(a)(4)(E) exempts it from making disclosures because it is "one [of the amici] listed in the first sentence of Rule 29(a)(2)."

what gives us "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971).

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government" in which their powers are "balance[d]." *Gregory v. Ashcroft*, 501 U.S. 452, 457–58 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). "They are each sovereign, with respect to the objects committed to it, and neither sovereign, with respect to the objects committed to the other." *McCulloch v. Maryland*, 17 U.S. 316, 410 (1819). If the sovereigns are to remain "dual" and their powers "balanced," *Gregory*, 501 U.S. at 457, then the federal court, "anxious though it may be to vindicate and protect federal rights and federal interests, [must] always . . . do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44. Otherwise, the dual-sovereign system reduces to a single sovereign, and "Our Federalism" ceases to exist. *Id.*

That threat to federalism is evident here. The consent decree over the New Orleans Police Department (NOPD) threatens the State's sovereign right to decide how to structure government and to provide for

2

the safety of its citizens and their property within the borders of the City of New Orleans. "The promotion of safety of persons and property is unquestionably at the core of the State's police power, and virtually all state and local governments employ a uniform police force to aid in the accomplishment of that purpose." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976). By expanding the consent decree beyond its terms, the district court threatens the State's sovereign right to decide how to structure government within its borders and to allow municipalities, like the City, to "aid" in providing for the "safety of persons and property" that "is unquestionably at the core of the State's police power." *Id.*

## SUMMARY OF THE ARGUMENT

Institutional reform consent decrees—like the one here—implicate a host of sensitive federalism concerns. These decrees transfer control over areas of core state responsibility to federal courts. They replace the state or local government officials elected to administer governmental bodies with a single, unelected, life-tenured federal judge who becomes the new administrator for the duration of the consent decree. Consent decrees also allow the original set of government officials to insulate their policy preferences from the democratic process and impose those

preferences on future officials. Because consent decrees undermine federalism and democratic principles, "federal court[s] must exercise [their] equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

The NOPD Consent Decree presents all the federalism and democratic concerns recognized by the Supreme Court. The State has enacted a series of constitutional provisions to promote the safety of Louisiana citizens and their property—an area of core state police power—in the City of New Orleans. Those provisions give the City authority to employ a uniform police force to aid the State in promoting safety within the City's borders. The consent decree suspends that governmental structure and the validity of the State's laws.

In August 2022, the City, recognizing these problems and having complied with 15 out of the consent decree's 17 topic areas, filed a motion to terminate or modify the consent decree. The City rightly was eager to resume the democratically responsive role contemplated for it by both the federal and state constitutions. But instead of trying to diminish the

problems inherent in consent decrees and "promptly" return core state powers to those elected to exercise them, *Hawkins*, 540 U.S. at 442, the district court is going in the opposite direction, claiming ever-greater control over the City and NOPD by reading new requirements into the consent decree—all in the shadow of the City's pending motion to terminate it.

The most recent example is the district court's order that city officials appear this Wednesday at a press conference dressed as a "public hearing" and speak in favor of certain initiatives not governed by the consent decree. The City is capable of deciding when and how to communicate with the press and public without orders from federal courts. And ordering city officials to express certain viewpoints to the public raises grave First Amendment concerns.

First Amendment issues aside, the "pernicious" threats to federalism inherent in all institutional reform consent decrees are on full display here. *See Allen v. Louisiana*, 14 F.4th 366, 375 (5th Cir. 2021) (Oldham, J., concurring). The district court is ignoring principles of federalism and pushing deeper and deeper into a core area of state sovereignty while leaving the City's motion to terminate on the shelf.

Canceling Wednesday's press conference is necessary to protect "Our Federalism" and begin the process of returning to the State its core police power and restoring the structure of government the State established for protecting its citizens and their property in the Crescent City.

## ARGUMENT

### I.   CONSENT DECREES IN INSTITUTIONAL REFORM CASES ARE "PERNICIOUS" THREATS TO FEDERALISM.

Civil cases seeking injunctive relief usually follow a straightforward three-step process: the court (1) finds that the defendant is doing something unlawful, (2) commands the defendant to stop doing the unlawful thing, and then (3) dismisses the case. In some cases, the final judgment accomplishes all three steps together. After dismissal, the parties can return to court, if needed, to enforce the injunction through contempt proceedings or to seek relief from the injunction. The court, however, neither keeps the case open to monitor the defendant's compliance with the injunction nor conditions dismissal on demonstrating a record of compliance.

Institutional reform cases, like this one, that seek injunctive relief against state or local governmental bodies are entirely different animals. These cases do not ask for a straightforward command to do or stop doing

something. Instead, they seek to impose long-running, tentacled injunctions on state or local governmental institutions—*this one has more than 700 individual requirements*—that essentially use federal equity power to remedy a violation of law by making a federal judge the chief administrator of an institution (like a state prison, hospitals, or police departments, etc.). Often the only path for the institution to end these injunctions and get the case dismissed is to establish a long record of near-perfect compliance.

Of course, federal courts have the "responsibility[,] . . . when appropriate, [to] issu[e] permanent injunctions mandating institutional reform." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018). But the Supreme Court and this Court have long instructed courts to be wary of equity's potential for sliding the balance of state and federal power—"Our Federalism," *see Younger*, 401 U.S. at 44—too far to the federal side by handing over core areas of state sovereignty to federal courts.

From the very beginning of our federalist system, "[t]he Founders worried that the equity power would so empower federal courts that it would result in the entire subversion of the legislative, executive and

judicial powers of the individual states." *In re Gee*, 941 F.3d at 167 (cleaned up). In response to this concern, "Hamilton sought to narrow the expansive Anti-Federalist reading of inherent judicial equity power and described Article III equity as a jurisdiction over certain types of cases rather than as a broad remedial power." *Id.* (cleaned up). Unfortunately, the Founders' worry that equity would swallow federalism became a modern reality in the form of institutional reform injunctions.

"[I]nstitutional reform injunctions are disfavored, as they 'often raise sensitive federalism concerns' and they 'commonly involve[] areas of core state responsibility.'" *Stukenberg*, 907 F.3d at 271 (quoting *Horne*, 557 U.S. at 448); *accord In re Gee*, 941 F.3d at 167 ("Courts are properly reluctant to grant such relief because of the federalism burdens it imposes."); *Frew v. Janek*, 820 F.3d 715, 721 (5th Cir. 2016) ("tak[ing] heed of the Supreme Court's admonition that the continued enforcement of the consent decree poses legitimate federalism concerns."). The Supreme Court "has even shaped substantive federal law around the assumption that it must avoid 'permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound

principles of federalism and the separation of powers.'" *In re Gee*, 941 F.3d at 167–68 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006)).

Institutional reform injunctions suffer from yet another set of federalism problems when they arise by party consent, which is very often the case. "Much has been written about the perniciousness of consent decrees," *Allen*, 14 F.4th at 375 (collecting cases and law review articles), because there is not much about a consent decree that resembles judicial decision-making. For example, institutional reform consent decrees relieve the court from ever having to:

- "determine whether 'the plaintiff established his factual claims and legal theories,'" Michael T. Morley, *Consent or the Governed or Consent of the Government? The Problems with Consent Decrees in Government Defendant Cases*, 16 U. Pa. J. Const. L. 637, 647 (2014) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971));

- "find[] that a statutory or constitutional violation has occurred," *id.* (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992); *Armour & Co.*, 402 U.S. at 682–83);

- "inquire into the precise legal rights of the parties," *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (quoting *Metro. Housing Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)); or

- "reach and resolve the merits of the claims or controversy," *id.* (quoting *Metro. Housing Dev. Corp.*, 616 F.2d at 1014).

9

In short, "[m]ost consent decrees reflect no judgment of any government official. A and B draft and approve the decree; court approval is a mere rubber stamp." *Allen*, 14 F.4th at 375 n.\* (Oldham, J., concurring) (quoting Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 133 (1987)); *see also La. State Conf. of NAACP v. Louisiana*, No. 19-cv-479-JWD-SDJ, 2022 WL 2753069, at \*5 (M.D. La. July 13, 2022) (explaining that the court adopted a consent order "without conducting a hearing, listening to testimony, or issuing formal findings of fact and conclusions of law").

Yet another federalism concern arises from the scope and duration of institutional reform consent decrees. They may encompass broader relief than the complaint seeks or than the court could have ordered through an adversarial trial. *See Rufo*, 502 U.S. at 392 ("[S]tate and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation . . . [and] also more than what a court would have ordered absent the settlement.").

10

And institutional reform consent decrees then bind future government officials to that broader relief: "Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Horne*, 557 U.S. at 449 (quoting *Hawkins*, 540 U.S. at 441). Inheriting "overbroad or outdated consent decrees" makes it difficult for state and local officials "to respond to the priorities and concerns of their constituents" and thus inhibits democratic principles of republican government. *Id.*; *accord* Mark Kelley, *Saving 60(B)(5): The Future of Institutional Reform Litigation*, 125 Yale L.J. 272, 303 (2015) ("Consent decrees involving government institutions pose a threat to democratic accountability: parties may negotiate public policy behind closed doors, and politicians may lock in future administrations, pander to private interests, and seek political cover.").

As for their promised benefits, institutional reform consent decrees rarely make good on reducing litigation, saving time and resources, quickly restoring plaintiffs' rights and defendants' control, or efficiently ending the case. *See, e.g.*, *Chisom v. Edwards*, 342 F.R.D. 1 (E.D. La. 2022) (30-year-old case refusing to dissolve consent decree); *Thomas v.*

11

*Sch. Bd. St. Martin Par.*, 544 F. Supp. 3d 651 (W.D. La. 2021) (60-year-old case refusing to dissolve consent decree). In practice, institutional reform consent decrees do not provide the same efficiency benefits that settlement agreements provide in private civil litigation. *See, e.g.*, *Horne*, 557 U.S. at 448 (noting "the dynamics of institutional reform litigation differ from those of other cases"). And "the longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Id.* at 453.

In 2018, the Attorney General of the United States recognized these federalism concerns and, in response, set narrow parameters for when and how USDOJ could agree to consent decrees. *See* Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Government Entities, https://www.justice.gov/opa/press-release/file/1109681/download.

The Attorney General of Louisiana, "the chief legal officer of the state," La. Const. art. 4 § 8, is well versed in just how "pernicious" consent decrees have been for Louisiana's state and local government. *Allen*, 14 F.4th at 375. He has waged battles to free the State from never-ending, ever-expanding consent decrees. *See, e.g.*, *Chisom v. Louisiana*, No. 22-

30320 (5th Cir.). He has fought the same fight for state agencies. *See, e.g., Berry v. Pastorek*, No. 2:10-cv-04049 (E.D. La.) (ongoing consent decree against the State's Board of Elementary and Secondary and Education). And he has a record of getting in the ring to help the State's local, political subdivisions extricate themselves from consent decrees. *See, e.g.*, Louisiana's Amicus Br. in Support of the Def.-Appellee, *Moore v. Tangipahoa Par. Sch. Bd.*, No. 21-30244 (5th Cir. Dec. 24, 2021); Louisiana's Mot. for Leave to Participate as Litigating Amicus, *Boudreaux v. Sch. Bd. of St. Mary Par.*, No. 6:65-cv-11351 (W.D. La. Apr. 5, 2022), ECF No. 119. The State has an interest in each of those cases— whether or not the State is a defendant—because the district courts took control of a core piece of the State's sovereignty.

For all of these reasons, individually and collectively, it is no wonder the Supreme Court has cautioned courts about the federalism dangers of institutional reform consent decrees and their potential to strike a blow at the very delicate balance of Our Federalism where state and federal powers are supposed to be balanced.

## II.   THE DISTRICT COURT'S OVER-READING OF THE CONSENT DECREE USURPS POWER FROM THE STATE.

The State of Louisiana has exercised its "unquestionable[]" core

police power to promote the safety of people and property by incorporating the City of New Orleans as a municipality and endowing it with authority to "aid in the accomplishment of [the State's] purpose" by employing its own police force. *Kelley*, 425 U.S. at 247.

A municipality is "an incorporated city, town, or village" that is a "[l]ocal governmental subdivision" or "[p]olitical subdivision." La. Const. art. 6 § 44(1)–(3). The Louisiana Legislature has authority to incorporate municipalities, like the City of New Orleans. La. Const. art. 6 § 2 ("The legislature shall provide by general law for the incorporation, consolidation, merger, and government of municipalities."). Only the Louisiana Legislature has that power. *Id.* ("No local or special law shall create a municipal corporation or amend, modify, or repeal a municipal charter.").

The Louisiana Legislature gave municipalities authority to govern themselves by "adop[ting] a "home rule charter" that "provide[s] the structure and organization, powers, and functions of the government of the local governmental subdivision." *Id.* § 5(A), (E). Home rule charters "may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs" as long

14

as the Louisiana Legislature has "not denied [that power] by general law" or the state "constitution." *Id.* § 5(E). Despite their home rule power, municipalities may not interfere with the State's police power: "the police power of the state shall never be abridged." *Id.* § 9(B).

The City of New Orleans is an incorporated municipality with a home rule charter that expressly gives the City authority over policing. "[T]he [C]ity of New Orleans was first incorporated in the year 1805." *City of New Orleans v. Anderson*, 9 La. Ann. 323, 324 (La. 1854). "On February 17, 1805, Governor William C. C. Claiborne approved *An Act to Incorporate the City of New Orleans* that had just been passed by the Legislative Council of the Territory of Orleans." New Orleans Public Library, *New Orleans Incorporated, 200 Years of the City Charter*, http://archives.nolalibrary.org/~nopl/exhibits/charter/charterintroductio n.htm. The 1805 city charter provided for a new mayor and "Conseil de Ville." Records 1805-1836, City Archives, New Orleans Public Library, http://archives.nolalibrary.org/~nopl/inv/neh/nehab.htm#ab4.    "The Council . . . had the power to make all laws and ordinances for the government of the municipal corporation and for regulation of the police of the city." *Id.*

In 1974, the Legislature enacted the current Constitution, under which the City's charter "remain[ed] in effect" and the City could "amend" it. La. Const. art. 6 §§ 4, 5(A). Much like the City's 1805 charter, the City's current home rule charter provides "the right, power, privilege and authority to adopt and enforce local police . . . regulations and to do and perform all of the acts pertaining to its local affairs, property and government which are necessary or proper in the legitimate exercise of its corporate powers and municipal functions." Home Rule Charter art. 2 § 2-101(4),

https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PAI_HORUCH_ARTIIPO_CH1PO.

Together, the provisions of the state constitution and local law discussed above reveal a structure of government for promoting the State's core police power over safety in New Orleans: the State incorporated the State as a municipality with power to govern itself, and the City exercised the power given to it by the State to pass a city charter that establishes a local police department.

That structure of government is nullified every day that the NOPD consent decree remains in place. It is as if the State never expressly

16

prohibited "the police power of the state" from ever being "abridged." La. Const. art. 6 § 9(B)). Proper sensitivity to those realities should have focused the district court's attention on "promptly" returning the "responsibility for discharging the State's obligations . . . to the State and [state and local] officials," *Hawkins*, 540 U.S. at 442, not seizing further power by ordering city and NOPD officials to and fro and telling them what to say and when, where, and to whom to say it.

## III. THE DISTRICT COURT SHOULD PROTECT FEDERALISM BY WORKING TO RETURN NOPD TO LOCAL CONTROL, NOT ORDERING INJUNCTIONS BEYOND THE CONSENT DECREE'S TERMS.

As the City's Mandamus Petition explains, nothing in the Consent Decree gives the district court authority to hold press conferences. The district court, of course, could hold a status conference or evidentiary hearing on the topics assigned for the press conference, and those proceedings presumptively would be open to the public and press. *See Craig v. Harney*, 331 U.S. 367, 374 (1947). But that isn't what is happening on Wednesday.

In March, the district court scheduled a "public presentation" at Loyola Law School. Order, Mar. 13, 2023, ECF No. 676. When the City declined the invitation, explaining that the consent decree did not give

17

the court authority to hold press conferences, the district court canceled the public meeting. Order, Mar. 28, 2023, ECF No. 678. Now the district court has rescheduled that meeting as a "public hearing," moved it to a courtroom while keeping the agenda identical, and ordered city officials to come and speak in favor of certain initiatives—all premised on the district court's over-reading of one paragraph in the consent decree. Order, Apr. 3, 2023, ECF No. 678.

The City's contractual agreement to "provid[e] necessary support and resources to NOPD to enable NOPD to fulfill its obligations under this Agreement" does not give the district court authority to order city officials to speak to the public about anything. Consent Decree, ¶ 12, ECF No, 565. Moreover, because the consent decree governs an area of core state police power, the district court should be working to narrow the consent decree as the City checks off requirements. The Supreme Court has given express approval for that practice in other institutional reform cases. *See, e.g., Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities.").

"The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Hawkins*, 540 U.S. at 442.

Sadly, the district court is headed in the opposite direction, reading the consent decree to expand the court's power while the City's motion to terminate the consent decree remains pending. Expanding the consent decree beyond its terms pushes the federal court even further into the State's core police power and prolongs the undemocratic suspension of the system of government that the State enacted in its constitution to promote safety in the City—all at a time when crime is through the roof. This situation cries out for mandamus relief. This Court should step in to protect federalism and start the process of restoring local control over NOPD by canceling Wednesday's press conference.

## CONCLUSION

For these reasons, the Court should grant the City's Mandamus Petition.

Respectfully submitted,

JEFF LANDRY
ATTORNEY GENERAL

19

/s/ *Elizabeth B. Murrill*
Elizabeth B. Murrill
  Solicitor General
  *Counsel of Record*
Shae McPhee
  Deputy Solicitor General
Morgan Brungard
  Assistant Solicitor General
Joseph Nelson
  Assistant Solicitor General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all counsel of record.

/s/ *Elizabeth B. Murrill*
Elizabeth B. Murrill
  Solicitor General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 21(d)(1) because it contains 3803 words, exclusive of parts of the brief exempted.

2.    This brief complies with Federal Rule of Appellate Procedure 32(c)(2), including the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Century Schoolbook font, with footnotes in 12-point Century Schoolbook font.

3.    This document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill

*Counsel for Amici Curiae*

Dated: April 10, 2023